# UNITED STATES  DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**KINTAD PHILLIPS**                                    **CIVIL ACTION**

**versus**                                                      **NO. 07-9730**

**N. BURL CAIN, WARDEN**                         **SECTION: "I" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Kintad Phillips, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On August 7, 1998, he was convicted of three counts of first degree murder.[1]  On August 8, 1998, he was sentenced on the convictions to consecutive terms of

---

[1] State Rec., Vol. VII of X, minute entry dated August 4, 1998, p. 4.

life imprisonment without benefit of probation, parole, or suspension of sentence.[2]   On May 30, 2001, the Louisiana Forth Circuit Court of Appeal affirmed those convictions and sentences.[3]   The Louisiana Supreme Court then denied petitioner's related writ application on May 24, 2002.[4]

On December 9, 2002, petitioner filed with the state district court an application for post-conviction relief.[5]  He later supplemented that application on or about January 28, 2003.[6]  The district court failed to act and ignored the orders of the Louisiana Fourth Circuit Court of Appeal directing it to rule on the applications.[7]   The Court of Appeal then subsequently considered petitioner's post-conviction claims and denied relief on October 31, 2006.[8]  The Louisiana Supreme Court likewise denied relief on September 21, 2007.[9]

---

[2] State Rec., Vol. VII of X, minute entry dated August 4, 1998, pp. 5-6.

[3] State v. Phillips, No. 2000-KA-1231 (La. App. 4th Cir. May 30, 2001) (unpublished); State Rec., Vol. IX of X.

[4] State v. Phillips, 816 So.2d 299 (La. 2002) (No. 2001-K-1952); State Rec., Vol. IX of X.

[5] State Rec., Vol. X of X.

[6] State Rec., Vol. X of X.

[7] See State v. Phillips, No. 2006-K-0085 (La. App. 4th Cir. Feb. 10, 2006) (unpublished); State v. Phillips, No. 2006-K-0688 (La. App. 4th Cir. June 16, 2006) (unpublished); State Rec., Vol. X of X.

[8] State v. Phillips, No. 2006-K-1296 (La. App. 4th Cir. Oct. 31, 2006) (unpublished); State Rec., Vol. X of X.

[9] State ex rel. Phillips v. State, 964 So.2d 325 (La. 2007) (No. 2006-KH-2869); State Rec., Vol. X of X.

On November 21, 2007, petitioner filed the instant federal application for *habeas corpus* relief.[10]  In support of his application, he asserts the following claims:

1.      Petitioner received ineffective assistance of counsel;

2.      The trial court's jury instructions were erroneous;

3.      The indictment was defective;

4.      The jury was tainted because one of the jurors was related to a co-defendant;

5.      Jury deliberations were tainted by the participation of an alternate juror;

6.      The trial court erred in failing to declare a mistrial;

7.      The record on appeal was incomplete; and

8.      Prejudicial evidence was wrongly admitted at trial.[11]

---

[10] Rec. Doc. 4.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner signed his federal application on November 21, 2007; therefore, that it the earliest date it could have been submitted to prison officials for mailing.

The Court notes that petitioner was denied leave to proceed as a pauper on December 28, 2007.  In light of that denial, this matter was not opened as an active case until the Court received the required filing fee on March 12, **2010**.  Despite petitioner's long delay in paying the filing fee, the United States Fifth Circuit Court of Appeals has indicated that the date the filing fee is paid is irrelevant in determining when such an application is "filed."  In Spotville v. Cain, 149 F.3d 374, 377 (5th Cir. 1998), the Fifth Circuit held that the "mailbox rule," not fee payment, is still determinative, noting: "[A] rule that payment of a filing fee upon the subsequent denial of IFP status determines the applicability of the AEDPA would be contrary to this court's traditional disposition of leniency toward pro se litigants."

[11] Petitioner's overlapping claims have been consolidated for ease of analysis.

The state concedes that petitioner's federal application is timely filed and that his claims are exhausted.[12]

Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2). Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

---

[12] Rec. Doc. 14, pp. 1 and 5-9.

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Courts cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28

U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application

for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a

determination of a factual issue made by a State court shall be presumed to be correct.  The applicant

shall have the burden of rebutting the presumption of correctness by clear and convincing

evidence.").

Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts

of this case as follows:

> On the late afternoon of February 5, 1995, New Orleans
> Police officers found the bodies of Tangie Thompson, Devyn
> Thompson and Andre White in their residence on Morrison Road.
> Each of the victims had multiple gunshot wounds from a 9-mm
> weapon, and most of the rooms of the house as well as the attic had
> been ransacked.  While one of the victims' vehicles, a white Lexus,
> was in the garage, their black Four Runner was found a few blocks
> away, abandoned with the keys in the ignition.  Despite an intensive,
> week-long analysis of the home and the vehicles, nothing was found
> that provided any clue to the identity of the killers.
>
> In early March 1995, another multiple shooting occurred in
> another area of New Orleans.[FN 1]   In connection with that
> investigation, a search warrant was executed at the residence where
> the defendant, Kintad Phillips, was said to live.  One AK-47 assault
> rifle bullet and a 9-mm magazine clip were seized by the police.[FN
> 2]
>
>> [FN 1]   Except to the extent discussed below in
>> connection with the defendant's second assignment of
>> error, the jury was not informed of this incident.
>>
>> [FN 2]  Ultimately, neither of these items were linked
>> to the instant murders.
>
> On May 6, 1995, a thirteen-year-old girl was wounded by
> gunshots during an armed robbery in Uptown New Orleans.[FN 3]

The perpetrators fled in a maroon Grand Am that was soon located and chased by the police.  Prior to the capture of the suspects, Robert Trackling, Donielle Bannister, and Romalice McGhee, two handguns were thrown from the Grand Am and recovered by the police.  One of these, a 9-mm Rugar, was found to be the weapon that had killed the three people at the Morrison Road residence earlier in the year.

> [FN 3]  Greater detail regarding this assault can be found in <u>State v. Bannister</u>, 97-0048 (La. App. 4th Cir. 1/27/99), 762 So.2d 1135.  However, the jury in this case heard only about the resultant chase, not about the shooting.

After this incident, the police were informed by an Orleans Parish Prison inmate that Robert Trackling had confessed to participating in the Morrison Road murders.  When questioned by the police on June 1, 1995, Mr. Trackling admitted that he had driven Kintad Phillips, Donielle Bannister and Juan Smith to the home on Morrison Road on the evening of February 4, 1995, but stated that he waited in the car while the other three went inside.  After being questioned for an hour or so, an audiotaped statement was taken and arrest warrants were issued for those named as the perpetrators.  Mr. Phillips turned himself in to Florida authorities in July 1995 and waived extradition.

In addition to other testimony and evidence presented at Mr. Phillips' August 1998 trial, Mr. Trackling's audiotaped statement was played, with transcripts provided for the jurors to follow.  Later, Mr. Trackling was called to testify pursuant to his plea agreement with the state.

Robert Trackling testified that he was home on February 4, 1995 when Mr. Phillips beeped him "in the evening sometime."  He was asked to drive Mr. Phillips and Mr. Bannister to rob someone, and was told that he did not have to do anything but just drive.  If he would take them, they would compensate him.  Upon arrival at Mr. Phillips' house, Mr. Trackling saw two assault rifles and a handgun on the table.  After waiting ten or fifteen minutes, they received the phone call for which they had been waiting, then drove to St. Roch Avenue, bringing the weapons with them.  Another man joined them there, introduced to Mr. Trackling as Juan Smith.  Mr. Smith stated they were going to New Orleans East to rob someone who had at least twenty thousand dollars on him, plus "a lot of dope."

After Mr. Smith located the house he was seeking on Morrison Road, Mr. Trackling stopped on a side street. He noticed as they got out of his car that Mr. Phillips and Mr. Smith put some masks and gloves into their pockets. Those two walked to the house carrying their weapons, apparently planning to wait for someone to get home. Rather than hanging around at the car, Mr. Trackling and Mr. Bannister walked about half-a-block to a bus stop to wait for the other two. After about fifteen or twenty minutes, the four got back into the car because no one was home. Mr. Smith directed Mr. Trackling to the intended victim's place of business, but neither the victim nor his white Lexus was spotted, so they went back to New Orleans East.

Mr. Phillips and Mr. Smith again got out of the car and approached the house on Morrison Road. They returned after five minutes or so and the group was preparing to leave when they noticed a light go on by the house. Mr. Trackling backed up his car to the driveway and they saw a man and a little boy standing near one of the cars in the garage. The three passengers jumped out of the car and ran toward their victims; Mr. Phillips and Mr. Bannister carried the assault rifles while Mr. Smith had the handgun. After Mr. Bannister grabbed the man and Mr. Phillips picked up the child, Mr. Smith closed the garage door. Mr. Trackling pulled his car into the driveway, turned off the engine and lights, then waited.

After about twenty or thirty minutes, Mr. Trackling saw a light come on, so he started his engine and began to back up. The garage door opened, and he saw the black Four Runner coming out, driven by Mr. Phillips. At that point, Mr. Trackling heard "a whole bunch" of gunshots, but it sounded like someone emptying the clip of a handgun rather than the firing of an assault rifle. Mr. Bannister and Mr. Smith ran out of the house and jumped in the Four Runner, stopping just long enough to hit the garage door button. Mr. Trackling took off, alone in his car, with the Four Runner following. He saw the others signalling with the lights for him to pull over, but he waited until he was on Crowder Boulevard, some distance from the house, to stop. The Four Runner was left on Crowder Boulevard with the doors unlocked and the keys in the ignition. When the three got back into Mr. Trackling's vehicle they were still carrying their guns, and Mr. Phillips and Mr. Smith were wearing gloves.

Mr. Trackling testified that during the ride back into the center of town, Mr. Phillips stated that he hoped someone would steal the Four Runner. The three men discussed the force Mr. Smith had used in hitting each of the victims, then told Mr. Trackling that there

was nothing in the house, so everyone would just go home.  Before being dropped off at his girlfriend's, Mr. Smith gave the 9-mm handgun back to Mr. Bannister.  Mr. Trackling took the other two back to Mr. Phillips' residence, then went home.  Two or three days later, the four got together again in St. Roch Park and laughed about the fact that police were investigating Benny Thompson, Tangie's ex-husband, in connection with the murders.

Mr. Trackling described the police chase that led to his arrest on May 6, 1995, acknowledging that the 9-mm gun thrown from the car was the same one Mr. Smith had used on February 4th.  He also testified regarding his questioning on June 1, 1995 and the circumstances surrounding the subsequent taped statement.  Mr. Trackling acknowledged prior convictions for attempted murder and attempted armed robbery, and admitted that he had pled guilty to three counts of manslaughter in connection with these killings.  He further explained that under his plea agreement with the State, he had received a ten-year sentence in exchange for his promise to testify truthfully concerning the Morrison Road murders, and that if he did not so testify he could be tried for three counts of first degree murder.  He identified the plea agreement to that effect, signed on July 2, 1996.

On cross-examination, Mr. Trackling admitted that nothing specific was said about shooting anyone before the men went into the house, so it was possible that, like himself, Mr. Phillips was unaware that anyone would be shot.  He further testified that he had never been arrested until May 6, 1995, and that that arrest had resulted in the jury verdicts of guilty to the charges of attempted murder and attempted armed robbery of a thirteen-year-old girl.  Mr. Trackling insisted that he was not guilty of that crime, but was convicted only because Mr. Bannister, who was identified as the shooter by the victim, had been caught in his car.  Mr. Trackling could not explain why he readily agreed to drive his friends to Morrison Road to commit a robbery, or why his conscience did not prod him to tell the police about his involvement in this triple murder before June 1, 1995.

Defense counsel then went through the many discrepancies between Mr. Trackling's audiotaped statement and his trial testimony.  While Mr. Trackling conceded that he had testified to a great many details that were not mentioned in his statement, he explained that this was because the police had not asked the right questions.  He acknowledged that he did not make a deal with the State until after his conviction for the May 1995 shooting, for which

he was facing a possible fifty years for attempted murder and more than forty-nine years for attempted armed robbery.  In addition, despite his knowledge that he could be sentenced to life imprisonment for his participation in this crime, he had rejected the State's first offer of twenty-five years for his testimony against the other three.  It was not until a year later, after his attorney had learned about the lack of physical evidence, that Mr. Trackling had accepted the State's offer of a ten-year sentence.  Mr. Trackling stated that in exchange for his testimony, he expects to be released after serving only five years for both the Morrison Road murders and the May 1995 shooting.  He admitted that, under his deal with the State, he would be facing the death penalty himself if he now said Mr. Phillips had nothing to do with this crime.[13]

<u>Ineffective Assistance of Counsel</u>

Petitioner claims that he received ineffective assistance of counsel.  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000).  The United States Supreme Court established a two-prong test for evaluating ineffective assistance claims, holding that a petitioner must demonstrate both that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  <u>Id</u>.

---

[13] <u>State v. Phillips</u>, No. 2000-KA-1231, pp. 1-6 (La. App. 4th Cir. May 30, 2001) (unpublished); State Rec., Vol. IX of X.

To prevail on the deficiency prong of the <u>Strickland</u> test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  <u>See</u> <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  <u>See</u> <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Matheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id</u>.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  <u>Crockett</u>, 796 F.2d at 793.  In order to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable

– 11 –

probability that he would have prevailed on appeal but for his counsel's deficient representation. Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

Because a claim of ineffective assistance of counsel is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  For the following reasons, the Court finds that neither of those conditions is met in the instant case.

Petitioner first claims that defense counsel erred in failing to object to the trial court's jury instruction concerning the law of principals and the necessity that all principals have the requisite intent to commit the crime.  On this point, Louisiana law provides:  "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."  La.Rev.Stat.Ann. § 14:24.  However, the Louisiana Supreme Court has explained that "an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. ...  It is not enough to find merely that his coconspirator or accomplice had the necessary mental state, since this intent cannot be inferred to the accused."  State v. Holmes, 388 So.2d 722, 726 (La. 1980).

In the instant case, petitioner argues that the jury was not instructed that he must have had the requisite intent to kill or to cause great bodily harm as is required to support a first degree murder conviction. However, that is simply untrue. The trial judge instructed the jury as follows:

> The question of principles [sic] to a crime. Who are principles to a crime? The law says, and I quote directly from the law by Statute 14:24: All persons concerned in the commission of a crime whether present or absent, whether they directly commit the act constituted in the defense or aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime are principles. In other words to be concerned in the commission of a crime it must be shown that the person or persons charged did something knowingly and intentionally in furtherance of a common design, or to put it another way he or they aided, or abetted or assisted in the perpetration of an offense. Mere presence at the time the offense is committed without the intention to participate or in any way contribute to its commission is not sufficient to make one a principle. To bring a person within the provisions of this article of the code it is necessary that the State show to your entire satisfaction and beyond a reasonable doubt that a person was in fact concerned in the commission of a crime.
>
> Now when we talk about the intent to commit a crime, here we're talking about an intent to commit a crime. *Thus to render one guilty as a principle in a specific intent homicide he must have* committed the offense himself or *in some way participated in the commission of the murder with the intent to kill or cause great bodily harm.*[14]

In light of the foregoing, it is evident that the jury was properly instructed on this issue. Accordingly, any objection to the instruction would have been meritless, and counsel cannot be found ineffective for failing to make meritless objections. Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); see also United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's

---

[14] State Rec., Vol. VII of X, transcript of August 6-8, 1998, p. 204 (emphasis added).

failure to raise a meritless argument ... cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

In a related argument, petitioner also claims that his appellate counsel was ineffective for failing to raise this same issue on appeal. That claim is likewise without merit. First, as noted, there was no objection to the instruction, and "failure of the defense to contemporaneously object to the jury instructions waives review of these issues on appeal." State v. Draughn, 950 So.2d 583, 622 (La. 2007); see also State v. Lee, 976 So.2d 109, 143 n.16 (La. 2008); La.C.Cr.P. arts. 801(C) and 841. Second, in any event, the jury instruction was proper, and, therefore, counsel was not ineffective for failing to raise a frivolous challenge to it. See, e.g., Anderson v. Quarterman, 204 Fed. App'x 402, 410 (5th Cir. 2006); Wilson v. Cockrell, 70 Fed. App'x 219, 230 (5th Cir. 2003).

Petitioner next claims that his counsel was ineffective for failing to move to quash the indictment on the ground that it was not returned in open court. Louisiana law expressly provides that "[i]ndictments shall be returned into the district court in open court ...." La.C.Cr.P. art. 383. However, as noted, petitioner bears the burden of proof with respect to his claim and, therefore, his claim fails unless he proves that the indictment was not returned in open court. He has not furnished this Court with such proof. Further, the state record indicates that the petitioner's allegation has no merit. On the indictment form, the minute clerk acknowledged that the indictment was "[r]eturned into open Court and recorded and filed August 17 1995."[15] Moreover, in any event, petitioner's claim also fails for another reason: he was not prejudiced by counsel's failure to file a

---

[15] State Rec., Vol. VII of X.

motion to quash.  Even if counsel had filed such a motion and the indictment had been successfully

quashed, that would have served no purpose other than to delay the trial.  Given the strength of the

case against petitioner, the state could have simply procured a new indictment.  Therefore, no

prejudice resulted from the failure to file such a motion.  Pickney v. Cain, 337 F.3d 542, 546 (5th

Cir. 2003); Parker v. Cain, 445 F.Supp.2d 685, 711 (E.D. La. 2006); Varnado v. Cain, Civil Action

Nos. 02-1286, 03-753, and 03-754, 2004 WL 2984804, at *6 (E.D. La. Dec. 21, 2004).

        Lastly, petitioner claims that his counsel was ineffective for failing to call Bobby

McCray and Marc Hendley as alibi witnesses.  However, it is clear that "complaints of uncalled

witnesses are not favored in federal habeas corpus review because allegations of what the witness

would have testified are largely speculative."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002).

Therefore, to show the prejudice required to support an ineffective assistance claim premised on the

failure to call a witness, a petitioner must show that the witness was available and would in fact have

testified at trial in a manner beneficial to the defense.  Id.; see also Bray v. Quarterman, 265 Fed.

App'x 296, 298 (5th Cir. 2008).  Here, petitioner has never presented either the state courts or this

Court with any evidence whatsoever in support of his bald allegations that the witnesses were

available and would have been willing to testify at trial in a manner beneficial to the defense.

Accordingly, he has not met his burden of proof, and his claim necessarily fails.  See Evans, 285

F.3d at 377 (a petitioner must bring forth evidence, such as affidavits from the uncalled witness, in

support of his claim); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D.

La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified;

rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses,

on that issue."); <u>Combs v. United States</u>, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); <u>Harris v. Director, TDCJ-CID</u>, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance."); <u>Daigle v. Travis</u>, Civ. Action No. 07-9425, 2008 WL 3562458, at *10 (E.D. La. Aug. 12, 2008); <u>see also</u> <u>Sayre v. Anderson</u>, 238 F.3d 631, 636 (5th Cir. 2001) ("A prisoner's bald conclusory assertion that supposed 'alibi' witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable." (quotation marks omitted)).

      In summary, petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claims.

Jury Instructions

      Petitioner next claims that the trial court gave erroneous jury instructions concerning reasonable doubt and circumstantial evidence.

As to reasonable doubt, petitioner claims that the trial court failed to instruct the jury that reasonable doubt can arise from the lack of evidence.[16]  That is untrue.  On this point, the jury was instructed as follows:

> You are prohibited by law and your oath from going beyond the evidence to seek for doubts upon which to acquit the Defendant or go beyond the evidence to acquit the Defendant.  You must confine yourself to a strictly dispassionate consideration of the testimony given upon the trial of this case.  You must not resort to any extraneous facts and circumstances in reaching your verdict.  That is you must not go beyond the evidence to find facts and circumstances creating doubt but you must restrict yourself to the evidence that you have seen and heard in today's case.  *However, the lack of evidence in the testimony introduced at the trial may be relied upon as the basis for the establishment of a reasonable doubt.  That can be the answer as to why you have a doubt.*[17]

Accordingly, petitioner's challenge to this instruction clearly has no merit.

Petitioner next argues that the trial court failed to properly instruct the jury concerning circumstantial evidence.  He appears to be challenging the following portion of the court's instruction:

> Now circumstantial evidence is legal and competent and must be considered by the jury together with the direct evidence, if any, which may have been introduced in the trial.  The jury should draw its inference only from those facts that have been proven beyond a reasonable doubt. When the evidence in a case consists of both direct and circumstantial evidence you must not convict unless you are satisfied beyond a reasonable doubt of the defendant's guilt.  When

---

[16] Louisiana law provides:  "In all cases the court shall charge the jury that ... [i]t is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence *or out of the lack of evidence* in the case ...."  La.C.Cr.P. 804(A)(2).

[17] State Rec., Vol. VII of X, transcript of August 6-8, 1998, p. 197 (emphasis added).

the evidence of a case consists exclusively of circumstantial evidence the rule is that assuming every fact to be proved that the evidence tends to prove in order to convict it must exclude every reasonable hypothesis or theory of innocence.[18]

That instruction is a correct statement of Louisiana law, which provides: "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.Rev.Stat.Ann. § 15:438. Moreover, to the extent that petitioner is arguing that the court erred in instructing the jury that the § 15:438 rule applies only in cases based exclusively on circumstantial evidence, he is wrong. That is, in fact, the law. See, e.g., State v. Giles, 639 So.2d 323, 327 (La. App. 4th Cir. 1994) ("[T]he circumstantial evidence instruction is only applicable when a case rests solely and exclusively on circumstantial evidence."). Accordingly, petitioner's challenge to this jury instruction is likewise meritless.

<u>Defective Indictment</u>

In his next claim, petitioner again argues, as he did in connection with his ineffective assistance of counsel claim, that the indictment was defective on the ground that it was not returned in open court. However, as previously noted, he offers no evidence in support of this bald allegation, and the indictment itself indicates that it was "[r]eturned into open Court and recorded and filed August 17 1995."[19] Moreover, in any event, where, as here, the state courts have found that the indictment was sufficient under state law, "a federal court need not address that issue."

---

[18] State Rec., Vol. VII of X, transcript of August 6-8, 1998, pp. 206-07.

[19] State Rec., Vol. VII of X.

– 18 –

McKay v. Collins, 12 F.3d 66, 68 (5th Cir.), reh'g granted in part on other grounds sub nom.,

Williams v. Collins, 12 F.3d 70 (5th Cir. 1994) (per curiam); Davis v. Cain, Civ. Action No. 07-

6389, 2008 WL 5191912, at *11 (E.D. La. Dec. 11, 2008); Forman v. Cain, Civ. Action No. 07-

4200, 2008 WL 1746710, at *9 (E.D. La. Apr. 14, 2008).  Accordingly, this claim fails.

Improper Juror

Petitioner alleges that after the guilty verdict was returned, but prior to the

commencement of sentencing phase, it was discovered that one of the jurors, Lionel Jones, was

related to Donielle Bannister, one of the participants in the crimes in this case.  Although petitioner

alleges that Jones was questioned in chambers regarding this issue, that fact is not noted in the state

court record and, if it occurred, apparently no transcript of the questioning exists.  The only

reference to this issue in the court record is the following notation in the minutes:

> COURT RECONVENED ON 08/08/98 AT 12:45 TO BEGIN THE
> PENALTY PHASE.
>
> AT THIS POINT, IT WAS POINTED OUT TO THE COURT THAT
> JUROR #10 LIONEL JONES IS RELATED TO ONE OF THE CO-
> DEFENDANTS AND HE WILL BE REMOVED FROM THE
> JURY.  HE WILL BE REPLACED BY ALTERNATE JUROR
> JOHN RIGNEY.[20]

---

[20] State Rec. Vol. VII of X, minute entry dated August 4, 1998, p. 4.

As an initial matter, the Court notes that there is no evidence whatsoever that Jones was untruthful during *voir dire*[21] or that the government had any reason to suspect that Jones might be biased.  Therefore, there is no basis for finding that Jones was wrongly accepted as a juror.

Likewise, there is no evidence that the jury deliberations were tainted by Jones' participation.  The Court is aware that petitioner's allegations are to the contrary:

> Mr. Lionel Jones, did have contact with petitioner's co-defendant, Darnell [sic] Bannister, before and after Mr. Bannister plead guilty to the Tangie Thompson murders.  He had direct knowledge of the facts related to the caw [sic] and he also shared the fact that his cousin had previously plead guilty in that case and that all participants were as guilty as his cousin, Darnell [sic] Bannister.[22]

However, as the state notes in its response, these allegations appear to be nothing more than rank speculation.  Petitioner certainly has presented no evidence in support of the allegations.  Moreover, there is no reason to believe that such evidence surfaced at the time Jones was removed, in that, as the state notes, defense counsel failed to move for a mistrial or seek any other remedial action.

Accordingly, the record reflects nothing more than the fact that Jones was related to Bannister, who was neither tried in the same proceeding nor testified at petitioner's trial.  In light of the complete absence of any evidence whatsoever that Jones actually had any knowledge concerning this case, considered such knowledge in making his decision on the verdicts, or imparted such knowledge to the other jurors, this Court has no basis for concluding that the state court

---

[21] The *voir dire* proceedings in this case were transcribed only in part, and it is unclear if Jones was even asked whether he knew or was related to Bannister or whether he had any knowledge about this case.

[22] Rec. Doc. 4-1, p. 35.

decision rejecting petitioner's claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

Petitioner further claims that the jury's deliberations were tainted by the participation of an alternate juror and that the trial erred in failing to declare a mistrial on that basis.  However, as the state notes in its response, there is simply no evidence whatsoever supporting these contentions.  Although the alternate jurors were not dismissed until the completion of the proceedings, there is no evidence that either of them actually participated in the deliberations with the twelve original jurors during the guilt phase of the trial.[23]  Clearly, therefore, there is no basis for granting relief based on petitioner's unsupported allegations.

Incomplete Record on Appeal

Petitioner next claims that his rights were violated because the record on appeal was incomplete.  The trial judge explained that the court was not able to furnish a complete transcript of the sentencing phase of trial:

My court reporters have searched the attic for either the tapes or the notes containing the sentencing in Mr. Phillips case.  The last tape found contained my instructing the jury to retire to deliberate in the sentencing phase.  No paper tapes could be found for August 8,

---

[23] As noted, Jones was replaced by the first alternate, John Rigney, for the penalty phase of the trial.  Out of an abundance of caution, the Court further notes that there is no evidence that the second alternate, Martin Kennedy, participated in the deliberations during the penalty phase of the trial.

1998, so therefore without the last audio tape of the day, the sentencing transcript cannot be produced.[24]

Citing state law, petitioner argues that the absence of a complete transcript impinged on his right to appeal.  However, even if state law was violated, that fact alone is of no moment. Federal *habeas corpus* relief may be granted only to remedy violations of the *federal* Constitution and laws of the United States; mere violations of *state* law will not suffice.  28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983).

Moreover, even if petitioner's claim is construed as also asserting a federal violation, the claim still fails.  The mere fact that the transcript was incomplete is insufficient to warrant federal *habeas corpus* relief.  Where, as here, the missing portions of the transcript were immaterial to the claims asserted on appeal, the record was adequate for full appellate review and there was no denial of a meaningful appeal.  See Schwander v. Blackburn, 750 F.2d 494, 497-98 (5th Cir. 1985); Williams v. Cain, No. 05-0710, 2008 WL 3363562, at *25-26 (E.D. La. Aug. 8, 2008); Collins v. Cain, Civ. Action No. 04-2292, 2007 WL 1589712, at *5 (E.D. La. June 1, 2007); Alford v. Cain, Civ. Action No. 05-2587, 2006 WL 2983038, at *13 (E.D. La. Oct. 17, 2006).

Accordingly, for the foregoing reasons, this claim has no merit.

### "Other Crimes" Evidence

Lastly, petitioner claims that his rights were violated by the wrongful admission of "other crimes" evidence.  At trial, it was established that the murder weapon was recovered during a car chase after an unrelated armed robbery.  During that car chase, a gun was thrown from the

---

[24] State Rec., Vol. X of X, letter from the trial judge to the Louisiana Fourth Circuit Court of Appeal dated August 3, 2000.

vehicle being pursued.  The car was subsequently stopped and found to contain Robert Trackling, Donielle Bannister, and Romalice McGhee.  The gun thrown from the car was recovered and determined to be the weapon used to commit the murders in the instant case.  Petitioner's claim appears to be that the evidence regarding the armed robbery, subsequent chase, and recovery of the weapon constituted inadmissible "other crimes" evidence.

The United States Fifth Circuit Court of Appeals has held:  "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."  Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  Therefore, to the extent that petitioner is arguing that the state courts merely misapplied state law in allowing introduction of the evidence, his claim is not cognizable in this federal proceeding.

That said, the Court will nevertheless note that the evidence at issue was not wrongly admitted.  While it is true that the prosecution may not introduce evidence of an accused person's unrelated crimes in order to prove his bad character,[25] that rule simply had no application here.  In

---

[25] Louisiana law provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

La. Code Evid. 404(B)(1).

the first place, petitioner was not involved in the armed robbery or the resulting chase, and "the prohibition against other crimes evidence pertains to other crimes by the *defendant, not other crimes of someone else*." State v. Buffington, 731 So.2d 340, 352 (La. App. 4th Cir. 1999) (emphasis added). Second, the evidence was not introduced as evidence of petitioner's character; rather, it was introduced to explain how police came into possession of the murder weapon. Such evidence was clearly admissible.

Moreover, to the extent that petitioner is arguing that the introduction of the evidence violated federal law, he has failed to demonstrate that he is entitled to *habeas* relief on that basis. The United States Fifth Circuit Court of Appeals has noted:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

In the instant case, even if the evidence at issue had been wrongly admitted, which it was not, it was not direct evidence of petitioner's guilt or his participation in the instant crimes, and it simply cannot be said to have played a crucial, critical, and highly significant role in his convictions. Rather, his convictions were clearly based on the testimony of Robert Trackling. Therefore, petitioner has failed to establish that the admission of this evidence resulted in a denial of fundamental fairness.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **Kintad Phillips** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[26]

New Orleans, Louisiana, this twenty-sixth day of October, 2010.


DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[26] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.